UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOHN SKOLEN and
LORA SKOLEN,

                Plaintiffs,

        v.                                 12-CV-515(LJV)(LGF)

UNITED STATES OF AMERICA,

                Defendant.

---

## **MEMORANDUM AND ORDER**

The complaint alleges that on October 8, 2009, plaintiff Lora Skolen was operating her motor vehicle—with her husband, plaintiff John Skolen, as a passenger—in Erie County, New York. Docket Item 1 at ¶¶ 8-9, 17. When the plaintiffs came to a stop at a stop sign at the end of a highway off-ramp, their vehicle was rear-ended by a "wheelchair van" owned and operated by the Department of Veterans Affairs. *Id.* at ¶ 8. On June 1, 2012, the plaintiffs commenced this case against the United States under the Federal Tort Claims Act, seeking to recover for personal injuries, loss of consortium, and property damage. *Id.* at ¶¶ 15, 22, 27, 32.

On January 27 and 30, 2015, after the conclusion of discovery, the defendant moved separately for summary judgment against both plaintiffs. Docket Items 46 & 52. After the motions were fully briefed, Magistrate Judge Leslie G. Foschio[1] issued a

---

[1] On August 6, 2012, United States District Judge Richard J. Arcara referred this matter to Judge Foschio. Docket Item 7. This case was reassigned from Judge Arcara to the undersigned on March 7, 2016. Docket Item 74.

Report and Recommendation ("R&R"), dated January 19, 2016, which recommended granting the defendant's summary judgment motions. Docket Item 68. Pending before this Court are the plaintiffs' objections to the R&R. Docket Item 69.

## STANDARD OF REVIEW

This Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to" and "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); *see* 28 U.S.C. § 636(b)(1).

## SUMMARY JUDGMENT

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant—i.e., the party seeking summary judgment—has the initial burden of showing that there is no genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met that burden, "the nonmoving party must come forward with specific facts" giving rise to a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

## DISCUSSION

Upon de novo review, this Court adopts all Judge Foschio's recommendations in the R&R with one exception: The plaintiffs' claim for $2,000 in property damage survives summary judgment. Because the plaintiffs failed to satisfy their burden to present objective medical proof of a serious injury causally related to the collision, this

2

Court agrees with Judge Foschio that the defendant's motions for summary judgment should otherwise be granted.

The plaintiffs object to the R&R's conclusions on the issues of "serious injury" and causation under New York's no-fault law. Those objections lack merit for essentially the same reasons set forth in the exceptionally detailed R&R, so there is no need to rehash all those issues. Nevertheless, this Court writes separately to address certain arguments raised in the plaintiffs' objections.

**I.    NEW YORK'S NO-FAULT LAW**

Under the Federal Tort Claims Act, the federal government waived its sovereign immunity to suits stemming from the negligent acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). As a result, New York's substantive law governs the plaintiff's claims. *See Rambarrat v. United States*, 227 F. App'x 82, 83 (2d Cir. 2007) (Summary Order).

New York has enacted a "no-fault" insurance scheme that restricts the rights of those injured in automobile accidents to seek recovery through the civil justice system for losses caused by others. *See* N.Y. Ins. Law § 5101, *et seq.* More specifically, under New York Insurance Law § 5104(a) ("Causes of action for personal injury"), a person injured in an automobile accident has "no right of recovery for non-economic loss, except in the case of a serious injury, or for basic economic loss." Both "serious injury" and "basic economic loss" are defined terms in New York Insurance Law § 5102 ("Definitions").

3

> "Serious injury" means a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d).

"Basic economic loss" means "up to fifty thousand dollars per person" of certain combined items, including loss of earnings and medical expenses, as set forth in New York Insurance Law § 5102(a).

## II. THE PLAINTIFFS' PROPERTY DAMAGE CLAIM

The R&R recommends that the defendant's motion for summary judgment be granted with respect to the plaintiffs' claims for economic loss, including a $2,000 property damage claim. *See* Docket Item 68 at 18, 70. The plaintiffs objected, arguing that the R&R "erroneously assert[s] that [the property damage claim] is a part of basic economic loss under Insurance Law § 5104(a)." Docket Item 69 at ¶ 4.

The plaintiffs are correct, and the defendant has conceded the point. Docket Item 73 at 24 (citing *Thornton v. Husted Dairy, Inc.*, 134 A.D.3d 1402, 1404, 23 N.Y.S.3d 760, 762 (4th Dep't 2015) ("Basic economic loss does not include property damage, including damage to a party's vehicle.")). This Court therefore rejects the R&R to the extent that it recommended granting the defendant summary judgment on the plaintiffs' claim for $2,000 in property damage.

### III. MR. SKOLEN'S PERSONAL INJURY CLAIM

The R&R recommends that John Skolen's personal injury claims be dismissed because he failed to raise a genuine dispute of material fact concerning whether he suffered a "serious injury," as defined in New York Insurance Law § 5102(d). Docket Item 68 at 25, 47, 55. The R&R further recommends that Mr. Skolen's personal injury claims be dismissed—regardless of whether he suffered a "serious injury—because he failed to raise a genuine dispute of material fact on causation. *Id.* at 69.

"[N.Y.] Insurance Law § 5102(d) sets forth nine specific categories of serious injury." *Schmitt v. Reeves*, 273 A.D.2d 295, 296, 710 N.Y.S.2d 541, 542 (2d Dep't 2000). "To qualify as a 'serious injury,' and thus be permitted to recover for negligence, plaintiff must demonstrate that [he] falls into one of the nine statutory categories." *Morrone v. McJunkin*, 1998 WL 872419, at *2 (S.D.N.Y. Dec. 15, 1998). In this case, Mr. Skolen attempted to established a serious injury based on: (1) a compression fracture of his T9 vertebra (the "fracture" category); (2) neck and spinal disc injuries, including disc herniations, bulges, and annular tears, that significantly or permanently limited his range of motion (the "permanent" or "significant limitation" categories); and (3) non-permanent injuries or impairments that prevented him from performing substantially all of his usual and customary daily material acts for at least 90 of the 180 days following the October 2009 accident (the "90/180" category). Docket Item 68 at 20-21.

As the New York Court of Appeals explained in *Licari v. Elliott*, "[t]here can be little doubt that the purpose of enacting an objective verbal definition of serious injury was to significantly reduce the number of automobile personal injury accident cases

litigated in the courts, and thereby help contain the no-fault premium." 57 N.Y.2d 230, 236, 441 N.E.2d 1088, 1091 (1982) (internal quotation marks omitted). In other words, the *Licari* Court "rejected the view that whether the plaintiff suffered a serious injury is 'always a fact question for the jury.'" *Morrone*, 1998 WL 872419, at *2 (quoting *Licari, supra*). Instead, "a court should decide the threshold question of whether the evidence would warrant a jury finding that the injury qualifies as a 'serious injury.'" *Yong Qin Luo v. Mikel*, 625 F.3d 772, 777 (2d Cir. 2010); *see Licari*, 57 N.Y.2d at 237, 441 N.E.2d at 1091 ("It is incumbent upon the court to decide in the first instance whether plaintiff has a cause of action to assert within the meaning of the statute.").

New York and federal courts therefore apply the following burden-shifting analysis to summary judgment motions that address whether a plaintiff has sustained a "serious injury":

> [O]n summary judgment, a defendant must establish a prima facie case that plaintiff did not sustain a "serious injury" within the meaning of Insurance Law § 5102(d). In support of its argument that there is no such serious injury, defendant may rely on the unsworn reports by plaintiff's physicians, but must provide evidence from its own physicians in the form of sworn affidavits. Once a defendant's burden is met, the plaintiff is then required to establish a prima facie case that he sustained a serious injury. For plaintiff to defeat a summary judgment motion, admissible evidence must be presented in the form of sworn affidavits by physicians.

*Luo*, 625 F.3d at 777 (quoting *Barth v. Harris*, 2001 WL 736802, at *2 (S.D.N.Y. June 25, 2001)). In this case, the defendant met its prima facie burden by submitting, among other things, the expert report of John Leddy, M.D. (Docket Item 50-12).[2] Mr. Skolen

---

[2] As a magistrate judge's opinion and order observed in another serious injury case:

> [Under] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), . . . summary judgment may be granted where the movant simply demonstrates an absence of sufficient evidence in the record to give rise to a question of fact regarding an issue on which the non-movant bears

6

therefore had "the burden to present objective medical proof of a serious injury causally related to the accident in order to survive summary dismissal." *Pommells v. Perez*, 4 N.Y.3d 566, 574, 830 N.E.2d 278, 282 (2005).

---

> the burden of proof. Thus, under a strict *Celotex* approach, it would appear that summary judgment could be granted on the issue of serious injury even if the defendant offers no medical evidence of its own, so long as plaintiff's evidence is insufficient to establish a triable issue of fact as to whether he or she has sustained a serious injury. The cases in this Circuit do not address this tension between *Licari* and its progeny on the one hand and *Celotex* on the other. In fact, the weight of authority appears to follow *Licari* without discussion.

*Thompkins v. Santos*, 1999 WL 1043966 at *8, n.3 (S.D.N.Y. Nov. 16, 1999); *see also Williams v. Elzy*, 2003 WL 22208349, at *3, n.2 (S.D.N.Y. Sept. 23, 2003) (reiterating those observations). Notwithstanding that, the *Thompkins* court chose to "apply the *Licari* test," "[g]iven the weight of authority following *Licari* and the absence of authority to the contrary." 1999 WL 1043966, at *8, n.3.

Another court, in *Citron v. Citron*, 2002 WL 32096588 (E.D.N.Y. Oct. 5, 2002), also apparently recognized the tension between *Celotex* and *Licari*. But the *Citron* court explained that:

> The requirements under *Celotex*, interpreting the federal procedural rules for summary judgment, provide this Court its guidance [on how defendants can meet their burdens] . . .
>
> It is important to note, however, that the rule of *Licari*—an opinion of the New York Court of Appeals—goes beyond simply addressing the procedural question of the standard for measuring a defendant's burden. *Licari* instructs this Court to recognize that the question of "serious injury" is a predicate to a party's success at articulating a claim under the Act. *See Licari*, 57 N.Y.2d at 237. As such, it is controlling authority for this Court in applying the substance of New York's insurance law.

*Citron*, 2002 WL 32096588, at *3, n.3.

In this case, the defendant's submissions are enough to meet a movant's initial burden under New York law and *Licari*. But these issues and the *Citron* court's explanation—at least for why federal courts look to New York summary judgment cases to determine whether "serious injury" plaintiffs have raised a genuine dispute of material fact—are worth noting, especially because this Court recently issued a decision in which the differences between New York and federal summary judgment law with respect to a movant's initial burden presented a significant issue. *See Acquisto v. Manitowoc Co., Inc.*, 11-CV-803(LJV)(JJM), 2017 WL 1192908, at *4 (W.D.N.Y. Mar. 31, 2017).

"In the context of soft-tissue injuries [such as herniated discs] involving complaints of pain that may be difficult to observe or quantify, deciding what is a 'serious injury' can be particularly vexing." *Id.* at 571, 830 N.E.2d at 281. "Many courts have approached injuries of [that] sort with a well-deserved skepticism." *Id.* Perhaps because of that skepticism, Mr. Skolen's claims of a "serious injury" are premised on more than simply soft-tissue injury and pain—that is, he also relies on "diagnostic MRIs taken before and after the subject accident" and an "expert's designation of a numeric percentage of a plaintiff's loss of motion." Docket Item 69 at ¶ 6 (quoting *Thomas-Young v. United States*, 2014 WL 1679474, at *2 (W.D.N.Y. Apr. 28, 2014). But "even where there is objective medical proof" of a serious injury, "summary dismissal of the complaint may be appropriate" when "additional contributory factors interrupt the chain of causation between the accident and claimed injury—such as a gap in treatment, an intervening medical problem or a preexisting condition." *Pommels*, 4 N.Y.3d at 572, 830 N.E.2d at 281.

Here, it is undisputed that Mr. Skolen had significant spinal injuries before the October 8, 2009 collision. *See, e.g.*, Docket Item 68 at 4-6, 49-50; Docket Item 69 at ¶ 34. He began treating with Thomas J. Taylor, D.C.—his treating chiropractor and his expert in this case—following an earlier motor vehicle collision in 2007. *See* Docket Item 59-1 at ¶¶ 5-7, 15. What is more, his history of neck pain extends back at least to 1978, after the first of five car accidents between that year and 1997. Docket Item 49 at ¶¶ 10-11; Docket Item 59 at ¶¶ 10-11. And according to the defendant's expert, John Leddy, M.D., "diagnostic x-ray and MRI studies show advanced and gradually advancing pre-existing degenerative disease that the medical records confirm was very

8

symptomatic and that required treatment for years prior to and leading up to October 8, 2009." Docket Item 50-12 at 10.

Mr. Skolen's evidence falls short when it comes to differentiating between his pre-existing condition and the "serious injuries" that he claims resulted from the October 8, 2009 collision. A review of each of the serious-injury categories on which he relies demonstrates exactly that. And for that reason, Mr. Skolen has failed to submit "objective medical proof of a serious injury causally related to the accident." *Pommells*, 4 N.Y.3d at 574, 830 N.E.2d at 282.

### A.     Fracture Category

A "fracture" is one category of "serious injury" under N.Y. Insurance Law § 5102(d), and Mr. Skolen claims that he suffered a "compression fracture" of his T9 vertebra as a result of the collision. That claim is premised on an October 15, 2009 MRI that Dr. Taylor ordered when he saw Mr. Skolen on October 9, 2009, the day after the collision. The radiologist's report for the October 15, 2009 MRI includes, among other listed "Findings," "a mild anterior wedge compression fracture of T9 [vertebra] with no associated bone marrow edema. No acute fracture or dislocation identified." Docket Item 51-7 at 2.[3] The "Conclusion" section of the radiologist's report then reiterates some of the radiologist's findings (e.g., "[s]mall right-sided T11-12 disc herniation"), but not the compression fracture. *Id.* Nevertheless, the plaintiff's expert, Dr. Taylor, believes that Mr. Skolen "sustained . . . the mild anterior wedge compression fracture of T9" as a result of the accident. *See* Docket Item 59-1 at ¶ 21.

---

[3] The October 15, 2009 MRI report can be found in several places in the record, including Docket Item 51-7 at 2 and Docket Item 59-1 at 63.

9

The defense expert disagrees.  The compression fracture was not noted on the report of the x-rays taken on the day of the accident (about a week before the MRI), which states, with uncanny specificity, that "[t]here is no evidence of a thoracic vertebral body compression fracture."  Docket Item 51-6 at 8.  Dr. Leddy reviewed and interpreted both the October 8, 2009 x-rays and the October 15, 2009 MRI at the defendant's request, and he found that the October 15, 2009 MRI "shows degenerative disc disease at T9-T10 and T11-T12.  There is no traumatic disc herniation at any level."  Docket Item 50-12 at 4.  Likewise, the x-rays showed "degenerative disease throughout the spine" but "[n]o fractures."  *Id.* at 5.  He concludes that there was "no MRI evidence of new traumatic fracture or disc herniation . . . as a direct result of the . . . accident," and physical findings since the accident were "consistent with degenerative spinal disease" not "causally related to the . . . accident."  *Id.* at 10.

In many cases, that might only tee up a battle of the experts within the factfinder's province to decide at trial.  But Dr. Taylor did not interpret the October 15, 2009 MRI; there is no sworn report or interpretation of the October 15, 2009 MRI from the radiologist in the record; and the medical records after the collision lack any further discussion of the fracture finding.  In fact, Dr. Taylor discussed the October 15, 2009 MRI in a detailed report that he prepared on October 16, 2009, but his report *does not even mention a compression fracture*.  *See* Docket Item 59-1 at 40-48.  Apparently, Dr. Taylor did not reference the fracture finding until he prepared his affidavit opposing summary judgment, approximately five years later.  As Judge Foschio correctly recognized, New York courts have found such evidence to be insufficient to defeat summary judgment.  Docket Item 68 at 25.

10

For example, in *O'Bradovich v. Mrijaj*—a case that is on all fours—the court found that a defendant was entitled to summary judgment when

> [Plaintiff's] expert opined that the accident caused a fracture of her calcaneus, the heel bone adjacent to the ankle. However, on this record, there is no admissible evidence that plaintiff was ever diagnosed by her treating physician with a fracture that resulted from this accident. The unsworn MRI report merely contains the reference to a "cortical or impact fracture." The medical records of plaintiff's treating physician neither reference this MRI nor adopt any findings contained therein pertaining to a possible fracture. Plaintiff's evidence shows only that she had ankle surgery to debride an osteophyte and remove bone spurs. The operative report makes no mention of a fracture, nor does plaintiff's expert (also her treating physician) refer to such a fracture in his initial evaluation of plaintiff approximately four months after the accident.

35 A.D.3d 274-75, 827 N.Y.S.2d 38, 38 (1st Dep't 2006). And several other New York decisions have since cited *O'Bradovich* in reaching similar conclusions. *See, e.g.*, *Brackenbury v. Franklin*, 93 A.D.3d 423, 423, 939 N.Y.S.2d 63, 64 (1st Dep't 2012) ("No fracture was diagnosed by his doctor contemporaneous with the accident, and the doctor's equivocal observation of a '[p]robable healed fracture' in an X ray taken a year and a half after the accident is insufficient.") (alteration in original); *Glover v. Capres Contracting Corp.*, 61 A.D.3d 549, 550-51, 877 N.Y.S.2d 75, 77 (1st Dep't 2009) ("There is no report referencing these findings, adopting them or correlating them with physical findings. Plaintiff has thus failed to demonstrate that she sustained a serious injury."); *Lowe v. A.M.S. Disc. Store & Transp., Inc.*, 20 Misc. 3d 140(A), 867 N.Y.S.2d 375 (App. Term, 1st Dep't 2008) ("Plaintiff's medical expert's belated assertion that plaintiff sustained a microtrabecular fracture to the right knee" was insufficient where there was "no evidence that plaintiff was ever diagnosed by his treating physician with a fracture resulting from this accident."). Based on that case law, Dr. Taylor's affidavit and its

11

reference to the October 15, 2009 MRI report, without more, are insufficient to establish a serious injury causally related to the accident based on the compression fracture.

Mr. Skolen's objections argue that the R&R's reliance on *O'Bradovich* is misplaced. Docket Item 69 at ¶ 8. He claims that the R&R "ignore[d]" a note in the medical records of Dr. Waghmarae, a physician treating Mr. Skolen for pain management, written several weeks after the collision at issue. *Id.* at ¶ 7. According to the plaintiffs' objections, Dr. Waghmarae "specifically include[d] the findings of the October 15, 2009 MRI and in fact bold[ed] the statement that: **There is a mild anterior wedge compression fracture of T9 with no associated bone marrow edema**." *Id.*[4]

But that argument attributes to Dr. Waghmarae a conclusion that his records do not support. The October 15, 2009 MRI report simply was copied-and-pasted—along with other medical records—into Dr. Waghmarae's office records. Dr. Waghmarae did not otherwise reference the fracture, let alone causally relate it to the accident. Mr. Skolen's argument that Dr. Waghmarae diagnosed or adopted the fracture finding because that part of the October 15, 2009 MRI report appeared in bold font is merely

---

[4] The plaintiffs' objections do not cite the specific portion of Dr. Waghmarae's records upon which this argument is based. They instead cite Docket Item 50-17, which consists of pre-accident records and does not include the October 15, 2009 MRI report or the fracture finding. According to the government's response to the plaintiffs' objections, the relevant portion of Dr. Waghmarae's records was not part of the summary judgment record. Docket Item 73 at 3, n.2. The government nevertheless attached the relevant portion of Dr. Waghmarae's records to its response papers, *id.* at 25-32, something this Court appreciates. A line in Mr. Skolen's reply suggests that this belated attachment was improper, *see* Docket Item 76 at 1 ("In so doing Defendant seeks to supplement the record . . . ."), but he obviously was not prejudiced because *he* is the party who sought to rely on the attachment to defeat summary judgment.

speculative, if not flatly incorrect.[5]  Certainly, it has no more probative value than a

physician's explicit but "equivocal observation" of a fracture, which was found to be

insufficient in *Brackenbury, supra*, 93 A.D.3d at 423, 939 N.Y.S.2d at 64.  Mr. Skolen's

current argument also directly contradicts his own statement of undisputed facts, in

which he expressly took the position that "Dr. Waghmarae's 'assessment' does not

indicate Mr. Skolen did or did not sustain a T9 fracture one way or the other."  Docket

Item 59 at ¶ 75.

Thus, after de novo review, this Court agrees with the R&R's conclusion that Mr.

Skolen failed to carry his burden of showing "a serious injury causally related to the

accident"[6] based on a compression fracture.  *See O'Bradovich, supra*.

B.    **Permanent and Significant Limitation Categories**

Mr. Skolen's objections also argue that, in addition to the compression fracture,

he suffered a "serious injury" based on "the specific range of motion limitations noted [in

Dr. Taylor's affidavit]," Docket Item 69 at 3, and the "permanent consequential limitation

---

[5] According to the plaintiffs:  "Dr. Waghmarae chose to [bold the fracture finding] for the obvious purpose of why anyone bolds type—to highlight that finding.  It was purposeful and intentional."  Docket Item 76 at 1-2.  But the October 15, 2009 MRI report clearly was scanned and copied-and-pasted into Dr. Waghmarae's records using imperfect text-recognition software, since there are nonsensical changes to text characters and bolding throughout the document.  On the same page as the fracture finding, a "5" has been changed to an "s"; a "1" to an "i"; an "l" to an "!"; etc.  *Compare* Docket Item 73 at 30 *with* Docket Item 51-7 at 2.  Just a few lines above the fracture finding, there is a sentence in which only the word "the" has been bolded.  Docket Item 73 at 30.  Most obviously the work of a computer, perhaps, is the vain attempt to recreate the stylized "PROSCAN Imaging" logo on the previous page using incorrect characters and an unusual font.  *Id.* at 29.  Simply put, no human being would or could have made those changes "purposeful[ly] and intentional[ly]."

[6] *Pommells*, 4 N.Y.3d at 574, 830 N.E.2d at 282.

of use of a body organ or member" or "significant limitation of use of a body function or system" categories of § 5102(d).

"For these two statutory categories," the New York Court of Appeals has held that whether a "limitation of use or function is 'significant' or 'consequential' (i.e., important . . .) relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part." *Toure v. Avis Rent A Car Sys., Inc.*, 98 N.Y.2d 345, 353, 774 N.E.2d 1197, 1201 (2002) (ellipses in original) (quoting Dufel v. Green, 84 N.Y.2d 795, 798, 647 N.E.2d 105, 107 (1995)). "In order to prove the extent or degree of physical limitation, an expert's designation of a numeric percentage of a plaintiff's loss of range of motion can be used to substantiate a claim of serious injury." *Toure*, 98 N.Y.2d at 350, 774 N.E.2d at 1200. "While there is no set percentage for determining whether a limitation in range of motion is sufficient to establish 'serious injury,' . . . cases have generally found that a limitation of twenty percent or more is significant for summary judgment purposes." *Hodder v. United States*, 328 F.Supp.2d 335, 356 (E.D.N.Y. 2004) (collecting cases). On the other hand, "[a]n expert's *qualitative* assessment of a plaintiff's condition also may suffice, provided that the evaluation has an objective basis and compares the plaintiff's limitations to the normal function, purpose and use of the affected body organ, member, function or system." *Toure*, 98 N.Y.2d at 350, 774 N.E.2d at 1200 (emphasis in original).

Although Dr. Taylor's affidavit compares Mr. Skolen's range-of-motion findings after the collision with "normal" values, Docket Item 59-1 at ¶ 12, that is not sufficient in light of Mr. Skolen's history. Here, it is necessary to compare Mr. Skolen's post-collision

condition not only to what is "normal" but also to his pre-collision condition.  *See, e.g., Jones v. United States*, 408 F. Supp. 2d 107, 119-20 (E.D.N.Y. 2006) ("While plaintiff has significant limitations in his neck and back functions, they are not the result of the January 2000 car accident; rather, they emanate from pre-existing cervical vertebrae degenerations and a disc herniation.").  In that regard, Mr. Skolen's proof is insufficient.

Dr. Taylor provided Mr. Skolen with chiropractic treatment "over a course of 20 visits" between December 7, 2007, and January 26, 2008 (the last time Dr. Taylor saw Mr. Skolen prior to the October 2009 collision).  Docket Item 59-1 at ¶¶ 7-10.  Dr. Taylor opines that Mr. Skolen's condition had improved by the end of that treatment, citing range of motion findings from orthopedic surgeon Dr. Anthony Leone in January and March 2008 .  *Id.* at ¶ 9.  Based on that and a comparison of December 2007 MRIs to the October 15, 2009 MRI, Dr. Taylor then concludes that the collision on October 8, 2009, must have caused new serious injuries.  *Id.* at ¶¶ 15, 21.  But, putting aside any issues of admissibility,[7] that opinion is simply a conclusion—and one that assumes there were no relevant changes to the plaintiff's condition over the 19 or 21 months between Dr. Leone's findings and the October 8, 2009 collision.

On this issue, Mr. Skolen's objections argue that the R&R assigned him "the impossible task of proving a negative."  Docket Item 69 at ¶ 9.  Not so.  Mr. Skolen continued to receive pain-management treatment from Dr. Waghmarae, the only physician who made range-of-motion findings both shortly before (July 2009) and shortly after (November 2009) the collision.  As noted in the R&R, a comparison of those findings does not reveal any significant limitation due to the collision; on the

---

[7] *See, e.g.*, Docket Item 68 at 31.

15

contrary, the findings show slight improvement in most areas. *See* Docket Item 68 at 38-39. Dr. Taylor's affidavit fails to address those findings or to explain why he relied on Dr. Leone's much less recent findings. Dr. Taylor's affidavit also completely fails to address Dr. Leddy's opinion that the Mr. Skolen's condition is the result of a "gradually advancing pre-existing degenerative disease."[8] Indeed, Dr. Taylor's own records (attached to his affidavit) contain numerous references to degenerative disc changes, which his affidavit neither explains nor even addresses.[9]

Therefore, after de novo review, this Court agrees with the R&R's conclusion that the plaintiff's evidence is insufficient to show a serious injury causally related to the accident based on the permanent or significant limitation categories. *See Khanfour v. Nayem*, -- N.Y.S.3d --, 2017 WL 809859, at *1 (1st Dep't Mar. 2, 2017) ("Since plaintiff's own medical records provided evidence of preexisting degenerative changes," expert's conclusory opinion "was insufficient to raise an issue of fact since it failed to explain how the accident, rather than the preexisting disc disease and osteophytes, could have been the cause of plaintiff's cervical spine condition"); *Cabrera v. Gilpin*, 72 A.D.3d 552, 553, 899 N.Y.S.2d 211, 213 (1st Dep't 2010) (expert's opinion insufficient where he "failed to address the conclusion of defendants' radiologist that plaintiff's condition was the result of a degenerative disease"); *Antonio v. Gear Trans Corp.*, 65 A.D.3d 869, 870, 885 N.Y.S.2d 48, 50 (1st Dep't 2009) (expert's opinion insufficient where it "failed to offer

---

[8] Docket Item 50-12 at 10.

[9] *See, e.g.*, Docket Item 59-1 at 14 (noting "severe degenerative disc changes" based on radiographic examination), 26 (cervical MRI report of November 12, 2008—i.e., roughly halfway between the most recent pre-collision evidence cited in Dr. Taylor's affidavit and the date of the collision—noting a half dozen different "degenerative" disc changes or conditions), 29 (Dr. Taylor noting "a history of degenerative disc disease . . ."), 33 (November 11, 2008 letter from Dr. Leone stating "I have not seen [Mr. Skolen] in a year and a half. His symptoms have not gotten any better.").

16

any quantitative assessment . . . of how the accident reduced the functioning of plaintiffs' spines below the level of function that existed immediately before the accident"); *see also Boroszko v. Zylinski*, 140 A.D.3d 1742, 1744, 32 N.Y.S.3d 424, 426 (4th Dep't 2016) (plaintiff could not rely on range-of-motion findings given lengthy time "between the prior record and [the accident], the evidence of various other accidents and injuries suffered by plaintiff during the intervening time period, and the more recent testing showing nearly identical range of motion deficits just before [the accident]"); *Luciano v. Luchsinger*, 46 A.D.3d 634, 635, 847 N.Y.S.2d 622, 624 (2d Dep't 2007) (expert's opinion insufficient because it "failed to provide any medical evidence of [plaintiff's] condition when he treated her prior to the subject accident so as to compare what [plaintiff's] limitations were before and after the subject accident").

### C. Remaining Objections

The R&R fully addresses the other infirmities of John Skolen's personal injury claims (e.g., proof on duration) and his claim of a serious injury based on the so-called "90/180 category."[10] Although the plaintiffs' objections point out some misstatements of fact in the lengthy R&R (e.g., degrees vs. percentages), those misstatements do not require different dispositions of their claims.

### IV. MRS. SKOLEN'S PERSONAL INJURY CLAIM

As the plaintiffs put it, the "objections to the Report and Recommendation relating to Plaintiff Lora Skolen are similar to those of Plaintiff John Skolen." Docket Item 69 at ¶ 37. The reasons that those objections lack merit are similar as well. In addition to the inadequacies of her proof, as set forth in the R&R, Mrs. Skolen—like her husband—

---

[10] The plaintiffs' attorney himself acknowledged at oral argument that the 90/180 category was the weakest of the bases for a serious injury with respect to both plaintiffs.

failed to satisfy her burden of showing that her claimed serious injuries resulted from the collision and not from a significant pre-existing condition.

Mrs. Skolen's objections on causation rely, to a large extent, on Dr. Taylor's opinion that she sustained "new" injuries as "a direct result of the October 8, 2009 accident," based on a comparison of a 2001 MRI with a post-accident October 15, 2009 MRI, which showed soft-tissue injuries. Docket Item 76 at 5. Of course, proof of a herniated disc or other soft-tissue injury alone is not sufficient to support a finding that plaintiff sustained a serious injury under the no-fault law. *Pommells*, 4 N.Y.3d at 574, 830 N.E.2d at 282; *Knijnikov v. Mushtaq*, 35 A.D.3d 545, 547, 827 N.Y.S.2d 198, 200 (2d Dep't 2006). But beyond that, Dr. Taylor's affidavit is inexplicably silent about Mrs. Skolen's extensive treatment for relevant pre-existing conditions between 2001 and the collision.

For example, Dr. Taylor states that "MRI studies from 2001 . . . revealed a moderate T6-7 disc herniation . . . and mild T2-3 and T3-4 disc bulges." Docket Item 62-1 at ¶ 6. Later, Dr. Taylor states—in a paragraph block-quoted in the plaintiffs' objections—that in comparison to the 2001 MRI, an "MRI performed October 15, 2009 revealed a new T7-8 herniation and bulging discs with annular tears at T4-5, T10-11, and T11-12. These injuries are new and a direct result of the October 8, 2009 accident." *Id.* at ¶ 13. But Dr. Taylor's affidavit lacks *any* discussion of the more recent pre-accident MRI of June 5, 2008, which Mrs. Skolen received in connection with her Department of Veterans Affairs ("VA") treatment for back pain. That 2008 MRI—like the 2009 MRI on which Dr. Taylor relied—*also* revealed a disc herniation at T7-8 and bulging discs at T4-5, T10-11, T11-12. Docket Item 56-13 at 6. In other words, each of

18

the thoracic discs[11] that Dr. Taylor claims showed a "new" injury after the collision had already been noted to have a similar (but mild) soft-tissue injury more than a year before the collision. Dr. Taylor simply does not address that, nor does he address the opinion of the defendant's expert physician, Douglas B. Moreland, M.D., on causation.

In fact, Dr. Moreland's report discusses in some detail Mrs. Skolen's VA records, which include the 2008 MRIs and her treatment for back pain shortly before the accident of October 8, 2009. He notes, with apparent incredulity, that she denied being "treated for back problems" prior to the accident, despite having received an epidural injection for back pain just three days before the collision.[12] There is no indication that Dr. Taylor ever considered those records or any of the plaintiff's treatment through the VA up to the date of the collision. His opinion therefore lacks probative value with respect to whether any of Mrs. Skolen's injuries are causally related to the collision.

## CONCLUSION

Upon de novo review, this Court adopts the R&R (Docket Item 68) with the exception of the plaintiffs' claim for $2,000 in property damage, which survives summary

---

[11] Because Mrs. Skolen claims are not limited to thoracic spine injuries, this comparison to the 2008 thoracic MRI is intended simply to illustrate how Dr. Taylor's affidavit fails to address the opinion of the defendant's expert that "the motor vehicle accident did not contribute anything to . . . chronic long standing changes." Docket Item 56-9 at 6.

[12] "She had received an epidural steroid injection three days before the motor vehicle accident in question here. She had 14 visits for low back pain with notes beginning on 6/4/08 up to 10/5/09. These complaints are similar to her post 10/8/09 motor vehicle accident. I should also state that I did ask her specifically at the time of my [IME] if she had been treated for back problems at the time of her motor vehicle accident and she denied this. Although she was a poor historian, the medical records are so conspicuous for chronic ongoing back problem with her last treatment being three days before the motor vehicle accident, I felt that she was consciously misrepresenting herself in this statement." Docket Item 56-9 at 4.

judgment. The defendant's motions for summary judgment (Docket Items 46 & 52) are otherwise granted. This Court will issue a text order scheduling further proceedings.

SO ORDERED.

Dated: April 25, 2017
Buffalo, New York

*__s/Lawrence J. Vilardo__*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE
